*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 21, 2022

Plaintiff-Appellee,

v

No. 348895
Otsego Circuit Court
LC No. 18-005512-FC

DEMARCO TRAYMAN PRYOR MCCOVERY,

Defendant-Appellant.

Before: GLEICHER, C.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree child abuse, MCL 750.136b(2). The trial court sentenced defendant to 20 to 50 years' imprisonment, which was an upward departure from the sentencing guidelines. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises out of the death of one-year-old AN. At the time of AN's death, defendant was in a relationship with the child's mother. On June 28, 2018, defendant was watching AN and her two siblings while their mother was at work.[1] Defendant laid AN down at 11:15 a.m., and returned to check on her six minutes later. As defendant picked AN up, she vomited a yellow liquid, and her arm went stiff. Defendant changed AN's diaper, changed his shirt, and loaded all three children and the dog into the car to go to the hospital. The hospital was only 3½ miles away, and defendant believed that he could arrive there more quickly than summoning an ambulance.

---

[1] AN was born on June 6, 2017. Her older siblings were four and two. Defendant was not the biological father of any of the children.

-1-

However, defendant ran out of gas and, because he had no cash, had to stop at four gas stations until he found one that would assist him. As a result, the trip to the hospital took 27 minutes.[2]

Upon arrival at the hospital, an emergency technician removed AN from her car seat and observed that her fingers, toes, feet, and lips were blue. Medical personnel attempted to resuscitate AN, but were unsuccessful. The forensic pathologist, Dr. Brian Hunter, ultimately determined that AN's cause of death was asphyxia because of mechanical restriction of chest wall motion and obstruction of the airway coupled with the prone or facedown sleep position.[3] A mechanical restriction of the chest wall would not necessarily result in a bruise or mark on the outside of the body. Dr. Hunter further concluded that the manner of AN's death was homicide.

Hospital workers train new parents on safe sleep practices before being discharged from the hospital.[4] Basically, new parents are advised that the infant should sleep in the crib alone on a tight fitted sheet. There should be no blankets, pillows, or other stuffed items in the crib. It is explained to the new parents that if these guidelines are not followed the infant could die. While defendant was not AN's biological father, testimony at trial established that he nevertheless was repeatedly trained on safe sleep practices, including instruction that an infant should not be swaddled in a blanket and should be placed on her back to sleep, by two different Child Protective Services (CPS) workers.[5] Moreover, the Pack N' Play where AN slept contained a warning label cautioning users about the danger of suffocation from blankets and pillows.

After AN's death, defendant voluntarily agreed to travel to the local Michigan State Police post for an interview with detectives. Defendant initially told detectives that AN vomited and then stopped breathing, so he performed chest compressions, but was unable to revive her. As the interview continued, the detectives expressed skepticism that AN's death occurred as defendant described. The detectives posited that her death was an accident, and defendant eventually admitted that he was aggravated with AN because she would not stop crying. He told detectives that he then tightly wrapped AN in an adult blanket to the point that she could not move her arms.

---

[2] The police estimated that the drive to the hospital should have taken between nine and ten minutes.

[3] Dr. Hunter also testified that the settling of the blood after death helped determine the position of AN's body at the time of death. Although the transcript identified this act of settling blood as "levity," it is apparent that Dr. Hunter defined "lividity." He testified that AN had lividity on both the front and back of her body, indicating that she was facedown when she died and turned over when aid was rendered.

[4] See MCL 333.5885.

[5] The reason for CPS involvement was not disclosed to the jury, but the record reflects that AN suffered two injuries in April 2018. The first injury was to AN's wrist from a rubber band while she was under defendant's care. The second injury involved defendant spanking ten-month-old AN's bare buttocks, inflicting visible bruises.

Additionally, defendant demonstrated that the blanket covered AN's nose and that he placed her facedown on a pillow. Defendant further admitted AN died as a result of suffocation.

Defendant was arrested and charged with first-degree child abuse and first-degree felony-murder, MCL 750.316(1)(b), for causing AN's death. After defendant was arrested, he reenacted and verbally described how he wrapped AN in a large blanket like a "paper towel roll." His reenactment was videotaped, and the video was played for the jury. During defendant's reenactment, a CPS worker remarked that what defendant did could have killed AN; defendant affirmed that observation.

The jury convicted defendant of first-degree child abuse, but acquitted him of first-degree felony-murder. After defendant filed his claim of appeal in this Court, he moved for a remand to the trial court for an evidentiary hearing to determine whether he was denied the effective assistance of counsel. Defendant asserted that defense counsel was deficient for failing to obtain the opinion of a pathology expert and that defense counsel was ineffective for failing to move to suppress defendant's statements made during the second portion of the police interview because the interview became custodial and defendant was not given his *Miranda*[6] rights. This Court granted the motion to remand.[7]

Thereafter, the trial court held an evidentiary hearing. In a 35-page written opinion and order, the court denied defendant's request for a new trial, finding that defendant was not deprived of the effective assistance of counsel at trial. This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

First, defendant alleges the evidence presented at trial was insufficient to support his first-degree child abuse conviction. We disagree.

A challenge to the sufficiency of the evidence is reviewed de novo. *People v Thorne*, 322 Mich App 340, 344; 912 NW2d 560 (2017). The evidence is examined in a light most favorable to the prosecution to determine whether a rational trier of fact could conclude that the prosecutor proved the elements of the crime beyond a reasonable doubt. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). "Minimal circumstantial evidence and reasonable inferences can sufficiently prove the defendant's state of mind, knowledge, or intent." *Id*. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

"A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child." MCL 750.136b(2); *People v*

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[7] *People v McCovery*, unpublished order of the Court of Appeals, entered December 3, 2020 (Docket No. 348895).

*Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). A person is a parent, guardian, or anyone "who cares for" or "has authority over a child regardless of the length of time that a child is cared for or "subject to the authority of that person." MCL 750.136b(1)(d). "Knowingly or intentionally" means that to convict a defendant of first-degree child abuse, the prosecution must prove that the defendant intended to cause serious physical harm or that he knew that serious physical harm would be caused by his actions. *People v Maynor*, 470 Mich 289, 295-296; 683 NW2d 565 (2004). "Serious physical harm" is defined as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f).

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence presented at trial for the jury to find defendant knew that his actions would cause serious physical harm to AN.[8] *Miller*, 326 Mich App at 735. In his interview with the detectives, defendant admitted he was frustrated that AN was crying. In this agitated state, defendant wrapped AN tightly in a large blanket several times like a paper towel roll. The blanket covered her nose and mouth, and she was unable to move her arms.[9] He then placed AN facedown on a pillow and left the room for six minutes. When he returned, she was no longer crying. CPS workers testified that they had previously instructed defendant that it was important to remove any blankets, pillows, or stuffed animals from the crib with AN to avoid suffocation.[10] And, during a surprise visit a couple of months before AN's death, one worker discovered AN sleeping with a small (2'x3') receiving blanket and pillow. The worker had defendant remove AN and the extra items, and, again, warned defendant about the dangers presented. While defendant argues that these safe sleep instructions were specifically directed at a child under one, the record reflects that defendant was informed that these best practices were to continue even after the child turned one.

Additionally, after defendant discovered that AN was nonresponsive and suspected that she was dead, he took the time to change her diaper, change his shirt, and elected to drive to the hospital with all the children and the dog. Although the hospital was located 3½ miles away, the trip took 27 minutes, not the typical 9 minutes, because defendant had difficulty purchasing gas.[11]

---

[8] This is the only element that defendant challenges on appeal.

[9] A CPS worker testified that swaddling allowed for limb movement and did not cover a child's nose or mouth.

[10] One CPS worker testified that he trained defendant on three different dates in April 2018, and provided a pamphlet depicting appropriate sleep practices. The second CPS worker estimated that he provided safe-sleep training to defendant twice a month between April and June of 2018, along with literature.

[11] In his brief on appeal, defendant contends that it was inappropriate to consider or exploit his economic circumstances in attempting to purchase gas. However, Detective David Geyer was asked during juror questions why the gas station purchases were investigated. The detective clarified that defendant admittedly suspected that AN was dead. Yet, defendant's decision to drive to the hospital and to seek gas from multiple stations did not comport with his statement that he

-4-

AN did not have a pulse when she arrived at the hospital and resuscitation efforts were unsuccessful. Defendant did not provide information to medical personnel regarding her condition prior to her arrival to facilitate her resuscitation, and staff at the hospital found defendant uncooperative and disruptive. A forensic pathologist determined that AN died from asphyxia because of restricted chest wall motion and restricted airway. Consequently, the exact danger about which defendant was repeatedly warned occurred when he disregarded proper sleep conditions.

Nonetheless, defendant contends that his actions were merely negligent and did not rise to the level of first-degree child abuse. He cites to the testimony from CPS workers that failure to comply with safe sleep practices is typically the result of poor judgment and not ill intent. However, after initially lying to the police about the circumstances, defendant ultimately admitted that he did not just place AN in a crib with a blanket and pillow to sleep. Defendant immobilized AN's upper torso by wrapping her so tightly in a large blanket that he impeded her ability to breathe; he then further blocked her airway, covering her nose and mouth with the same blanket, before placing her facedown into a pillow. He did so because he was aggravated that AN would not stop crying. In light of CPS's multiple trainings, defendant did not simply engage in poor judgment, he knew that serious physical harm could result from his actions. Notably, defendant himself recognized that he was aware his actions could have killed AN in the video reenactment.

Examining the evidence in the light most favorable to the prosecution, including defendant's acts after he discovered that AN was unresponsive, a reasonable jury could conclude that defendant knew that his actions would result in serious physical harm to AN. *Maynor*, 470 Mich at 295. Defendant's challenge to the sufficiency of the evidence offered to support his first-degree child abuse conviction is without merit.

## B. TESTIMONY FROM INVESTIGATING DETECTIVES

Next, defendant submits that the trial court erred by allowing inadmissible testimony from the investigating detectives addressing whether they believed that defendant was telling the truth during his police interview. Additionally, he asserts that defense counsel was ineffective for failing to object to the inadmissible testimony. We conclude that defendant failed to demonstrate plain error affecting substantial rights from the admission of this testimony. Further, defendant has not met his dual burden of establishing that counsel performed deficiently and that counsel's deficient performance prejudiced him.

The appellate court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Edwards*, 328 Mich App 29, 41-44; 935 NW2d 419 (2019). Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

---

could arrive at the hospital faster than an ambulance. The time spent at the gas stations delayed medical resuscitation efforts upon AN. Additionally, the investigation of the gas station visits assisted in providing a timeline of events rather than an improper economic purpose.

An abuse of discretion occurs when the trial court's decision rests outside the range of reasonable and principled outcomes. *People v Baskerville*, 333 Mich App 276, 287; 963 NW2d 620 (2020).

Defendant did not object to the admission of this testimony in the trial court. Unpreserved evidentiary issues are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999); *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2019). "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *People v Lockridge*, 498 Mich 358, 392-393; 870 NW2d 502 (2015). The requirement that the error was plain generally requires a showing of prejudice such that the error affected the outcome of the lower court proceedings. *Id.* at 393. Even if the plain error criteria are satisfied, the appellate court must exercise discretion in determining if reversal is warranted. *Id.* "Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence." *Id.*

"[I]t is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). This type of testimony is unnecessary because credibility determinations are to be made by the jury which is equally capable of evaluating the witness testimony. *Id.* However, "lay witnesses are qualified to testify about the opinions they form as a result of direct physical observation." *People v Hanna*, 223 Mich App 466, 475; 567 NW2d 12 (1997). "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701; see also *People v Oliver*, 170 Mich 38, 50-51; 427 NW2d 898 (1988) (concluding that police officers could testify regarding their opinion that dents in the car were caused by bullets in light of their experience).

Defendant takes issue with several statements provided by Detective David Geyer and Detective Jamie Voss. During Detective Geyer's testimony, he gave an overview of interrogation techniques. He explained the goal of questioning was to obtain the truth. Thus, the interviewer attempts to establish a rapport with the suspect to make him feel relaxed. Additionally, the interviewer would empathize or minimize the suspect's actions to achieve the rapport. Consequently, the interviewer might proffer that the incident was the result of an accident. Detective Geyer also explained that when a suspect fabricated a story, it became more difficult for the suspect to remember the original story. Therefore, the story would change as the suspect continued to talk. He testified that appropriate application of the questioning was not to induce a suspect to be deceitful, but to determine what actually transpired.

Defendant alleges that Detective Geyer invaded the province of the jury by concluding that the statements that defendant made at the end of the interview were "completely truthful." However, a review of Detective Geyer's testimony, in context, indicates that his statements were not improper. As a preface to this testimony, Detective Geyer established interview techniques, the goal of the interview, his general experience as a police officer interviewing suspects, and his perception of defendant's interview. See *Hanna*, 223 Mich App at 476. In light of the change in defendant's statement to the police, Detective Geyer was asked to address why he determined that

defendant's latter statement of suffocation was believed as opposed to defendant's earlier account that AN vomited, stiffened, and stopped breathing. In context, this testimony presented a general account in light of his training and experience and contact with this defendant and was permissible. *Id*. Moreover, it is apparent that *defense counsel* sought to bring forth opinion testimony regarding the ultimate issue. Specifically, with Detective Geyer, defense counsel was able to elicit the conclusion that this detective believed defendant's statement that he did not intent to kill AN, a fact pertinent to the charge of first-degree felony-murder of which defendant was acquitted.

Similar to Detective Geyer, Detective Voss testified that the goal of the interview was to elicit the truth and that a fabricated story was difficult to maintain by the suspect. Over time, Detective Voss had developed an interview technique that was the culmination of different trainings, but was also contingent on the type of person interviewed. He initially testified that he reached conclusions about whether a story was believable and if it could happen in the manner described. In his experience, a suspect generally became quiet before choosing to tell the truth and telling the truth made the suspect feel better.

However, Detective Voss also made several statements that asserted that defendant's ultimate confession was completely truthful. Detective Voss testified that "he realized [defendant] was telling the truth" when defendant told the detectives that AN suffocated. He also testified that defendant "began to tell the truth" after he completed the written statement. Detective Voss proffered that defendant "actually gave us the truth of what happened" after bringing up suffocation. In addition, he stated that an innocent person would not confess. These statements were improper. See *Musser*, 494 Mich at 349. Although defense counsel did not object to these statements, the trial court excused the jury and specifically cautioned Detective Voss against providing this type of testimony. While this did not cure the error by itself, because there was more than sufficient evidence to convict defendant, outside of Detective Voss's testimony, plain error affecting defendant's substantial rights did not occur from the admission of this testimony. See *Carines*, 460 Mich at 763.

Moreover, the trial court instructed the jury that "[a]s jurors you must decide what the facts of the case are. This is your job and no one else's." The jury was also told it was required first to determine if defendant made the statement and then choose the appropriate weight to give it. The court explained that the testimony from police officers was to be judged by the same standard used to evaluate the testimony of any other witness. "Jurors are presumed to have followed their instructions." *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011). Given this, we conclude that defendant has not established plain error and that reversal is warranted. *Lockridge*, 498 Mich at 393.

Defendant also raises an alternative argument that defense counsel provided ineffective assistance for failing to object to the detectives' opinion testimony. To preserve a claim of ineffective assistance of counsel, defendant must request a new trial or an evidentiary hearing in the trial court. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018). Although an evidentiary hearing was conducted addressing defense counsel's failure to obtain an expert witness or to seek suppression of evidence, effective assistance of counsel in the context of the admission of the detectives' testimony regarding witness truthfulness was not addressed in the trial court. Consequently, this issue is unpreserved.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *Miller*, 326 Mich App at 726. When no *Ginther*[12] hearing addressing an issue is held in the trial court, appellate review is limited to mistakes apparent on the record. *Id*. Thus, this unpreserved claim of ineffective assistance of counsel is reviewed "for error[] apparent on the record." *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020).

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

"[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). "[F]ailing to raise an objection may be consistent with a sound trial strategy." *People v Isrow*, Mich App ___, ___ NW2d ___ (2021) (Docket Nos 351665; 354834), p 5. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). Counsel may be found ineffective, however, for the strategy employed when it is not a sound or reasonable strategy. *People v Dalessandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

As to the detectives' testimonies that we have concluded were admissible opinions or perceptions, defense counsel was not deficient for failing to object. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Further, it was not demonstrated that defense counsel's failure to object to the inadmissible testimony regarding defendant's truthfulness fell below an objective standard of reasonableness. On cross-examination of Detective Voss, defense counsel questioned this detective about obtaining false or "compliant" confessions to which the detective answered that he had no training or knowledge. In particular, defense counsel cross-examined Detective Voss regarding whether innocent people confessed and the extensive research showing that innocent people may, in fact, confess to crimes. Detective Voss admitted that he was not familiar with that research. Defense counsel also questioned Detective Voss concerning the circumstances surrounding defendant's interview and whether defendant was uncomfortable or pressured to confess. And, during closing argument, defense counsel asserted that Detective Voss's belief that innocent people do not confess was wrong and implied that defendant's admissions were the result of suggestion by the

---

[12] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

detectives and deceptive interview techniques. Thus, the record indicates that defense counsel sought to elicit opinion testimony to the extent it would negate an intent to kill for purposes of felony-murder, see *People v Seals*, 285 Mich App 1, 12; 776 NW2d 314 (2009), and to explain that any culpable statements made by defendant should be construed as pressured or compliant false confessions. On this record, we cannot second-guess this strategy, particularly when it yielded an acquittal of first-degree felony-murder. *Dunigan*, 299 Mich App at 589-590.

Further, even if defense counsel's performance fell below an objective standard of reasonableness for failing to object to Detective Voss's inadmissible testimony, defendant has not demonstrated that there is a reasonable probability of a different outcome. *Spaulding*, 332 Mich App at 656. First, the prosecution played a video recording of the reenactment that defendant performed for law enforcement and CPS workers. As a result, the jury could assess defendant's actions, demeanor, and explanation for itself.

Next, defendant, AN's sole adult caretaker, disregarded repeated safe-sleep instructions and immobilized AN inside a large blanket, covering her mouth and nose, before positioning her facedown atop a pillow to stop her crying. Defendant himself recognized that his actions could kill AN. When defendant returned, AN's condition was dire; yet, he did not immediately seek medical assistance. Instead, he opted to transport AN to the hospital, but delayed in doing so. By the time he arrived, AN's extremities and lips were blue, and she was limp. Defendant never contacted AN's mother, and, at the hospital, was uncooperative and disruptive, failing to provide a history for AN's condition to facilitate treatment.

Finally, the emergency room physician testified that it was unusual for a one-year-old to suffer from cardiac arrest. The physician opined that AN apparently stopped breathing, and her respiratory arrest caused her cardiac arrest. The forensic pathologist who performed AN's autopsy testified that she died from asphyxia because of mechanical restriction of her chest wall motion and obstruction of her airway. Additionally, AN had lividity to the front of her body as well as the back, indicating she had been facedown and turned over after death. Given this strong evidence of first-degree child abuse, it was not reasonably probable that counsel's failure to object to any improper police testimony affected the trial's outcome. *Spaulding*, 332 Mich App at 656.

## C. FAILURE TO CONSULT AN EXPERT

Defendant further asserts that defense counsel provided ineffective assistance by failing to consult an expert in pathology to support the defense's case. We disagree.

"[A] defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a *reasonable, informed determination* as to whether an expert should be consulted or called to the stand[.]" *People v Trakhtenberg*, 493 Mich 38, 54 n 9; 826 NW2d 136 (2012) (quotation marks and citation omitted). Consultation with a potential expert, in some cases, is part of counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015) (quotation marks and citation omitted).

Again, "decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *Dunigan*, 299 Mich App at 589-590. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel. *People v Jurewicz*, 506 Mich 914; 948 NW2d 448 (2020).[13] Accordingly, defendant was required to demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *Id*., citing *Trakhtenberg*, 493 Mich at 51.

In this case, Dr. Hunter, who conducted AN's autopsy, testified that her cause of death was asphyxia because of mechanical restriction of her chest wall motion and obstruction of her airway. Dr. Hunter opined that AN's manner of death was homicide, meaning that death occurred at the hands of another.[14] Defendant did not dispute Dr. Hunter's conclusion in regard to AN's cause of death. Rather, defendant's position at trial was that her death did not have the requisite intent.

Defense counsel testified at the evidentiary hearing. He had been an attorney for eleven years. Seventy-five percent of his practice was comprised of criminal cases, but this was his first murder trial. He had defended first-degree child abuse cases, but this was the first he had taken to trial. He considered consulting an expert pathologist early in the case and read scholarly articles pertaining to forensic pathology. Eventually, he concluded that Dr. Hunter's autopsy findings supported the defense's theory of the case. Defense counsel remembered that Dr. Hunter changed the manner of death after speaking with police officers, which meant that without that information, Dr. Hunter would have classified the manner of death as undetermined.[15] Moreover, Dr. Hunter acknowledged that the homicide classification did not address the actor's intent. Defense counsel believed that his main focus should be on the intent required to establish homicide and that, on cross-examination, Dr. Hunter would agree that a homicide could not be established under these facts and circumstances.

After trial, defendant obtained the services of forensic pathologist Dr. Ljubisa Dragovic. Dr. Dragovic agreed that AN's cause of death was asphyxia. However, he opined that accident

---

[13] Although the *Jurewicz* decision was rendered in an order, Supreme Court orders with an understandable rationale constitute binding precedent. *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

[14] Manner of death is divided into five general categories: natural, homicide, suicide, accident, and indeterminate. Homicide is where death results from the purposeful act of another while accident is where the fatal outcome is unintentional.

[15] Defendant contends that there was no evidence of an earlier death certificate or two reports. But the deputy medical examiner, who also separately served as a police officer, was present during defendant's reenactment and responsible for investigating AN's death and gathering information for the medical examiner. Regardless, Dr. Hunter agreed that without additional information from the police, his classification would have been undetermined.

could not be ruled out as the manner of death. Dr. Dragovic acknowledged that swaddling AN was an intentional act, but he explained that the action was done to pacify the child. Dr. Dragovic opined that people can be instructed about safe-sleep practices multiple times, but accidents continue to happen. He believed that AN's death was the result of "stupidity." But Dr. Dragovic did not review the reenactment video, wherein defendant affirmed that his actions of wrapping AN in a blanket so tightly that she could not move her arms, covering her nose and mouth, and placing her facedown could kill her. Nor did Dr. Dragovic read the testimony concerning the number of times that defendant was instructed on safe sleep—six.[16] Dr. Dragovic candidly conceded that may have altered his opinion if provided with additional information.

The trial court found that Dr. Dragovic's testimony was premised on a "less-than-full examination of the documentary and testimonial records" because the pathologist did not examine defendant's reenactment video or have knowledge of defendant's extensive safe-sleep training. The trial court also noted defense counsel's focus on negating the specific intent to kill and eliciting Detective Geyer's belief that defendant did not intend to kill AN.[17] Following these key factual findings,[18] the trial court concluded that the claim of ineffective assistance of counsel failed. It determined that: (1) Dr. Dragovic's opinion was premised on incomplete information despite his recognition that "a forensic pathologist must look at *all of the circumstances* to determine a manner of death since not every intentional act resulting in a death qualifies as a homicide"; (2) even in the absence of Dr. Dragovic's opinion, defense counsel successfully defended the primary charge of felony-murder; and (3) it was not reasonably likely that a defense expert would have made a difference in the outcome of the case.[19] *Hoag*, 460 Mich at 6. Based on the record, we cannot

---

[16] At trial, one of the CPS workers estimated the number of times he reviewed safe-sleep protocols with defendant. At the evidentiary hearing, the other worker testified about the documented instruction.

[17] Although defense counsel initially asked the trial court to instruct the jury on accident as a defense, he withdrew that request, opting to focus the jury on defendant's lack of the requisite intent. Defense counsel's decision regarding a defense is a matter of trial strategy. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995). The law affords defense counsel "wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (citation omitted).

[18] The trial court did *not* find that trial counsel lacked the necessary experience and failed to perform the necessary research as claimed by appellate counsel, factual findings necessary to support the raised claim of ineffective assistance of counsel.

[19] Although the trial court also cited to caselaw addressing the failure to present a substantial defense in the context of ineffective assistance, the trial court nonetheless determined that the evidence proffered by defendant at the evidentiary hearing would not have caused a different outcome in the case. Going forward, the trial court should follow *Jurewicz*, 506 Mich at 914 ("[t]he defendant was not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense.").

conclude that the trial court's factual findings were clearly erroneous. *Miller*, 326 Mich App at 726.[20]

## D. FAILURE TO MOVE TO SUPPRESS STATEMENTS

Defendant contends that defense counsel was also ineffective for failing to move to suppress his statements from the second portion of the police interview. We disagree.

"Every person has a constitutional right against self-incrimination." *Id*., citing US Const, Am V; Const 1963, art 1, § 17. "To effectuate this right, the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation." *Barritt (After Remand)*, 325 Mich App at 561. " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id*. at 562 (citations omitted). To determine whether a person is in custody, the first step is to ascertain whether, in light of "the objective circumstances of the interrogation a reasonable person [would] have felt he . . . was not at liberty to terminate the interrogation and leave." *Id*. The relevant circumstances that a court must consider are: "(1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning." *Id*. at 562-563. "[N]o one circumstance is controlling; rather, a reviewing [c]ourt must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under *Miranda*." *Id*. at 563.

"The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Barritt (After Remand)*, 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted). "This Court reviews for clear error the trial court's factual findings concerning the circumstances surrounding statements to the police." *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

Addressing the first *Barritt* factor, the location of the questioning, the court acknowledged that the interview took place at a state police post. However, it further noted defendant was advised that he was not in custody, the interview was voluntary, he could leave at any time, and the door was unlocked. Indeed, defendant voluntarily exited the room after writing his statement. The trial court concluded that a brief break of approximately six minutes between the first and second

---

[20] Regardless of defense counsel's failure to present Dr. Dragovic's testimony, he elicited testimony from Detective Geyer that defendant did not intend to kill AN, an assertion that the prosecution did not dispute. Further, the medical examiner, the police, and the CPS workers acknowledged that, despite education efforts, parents did not follow safe-sleep practices and infant deaths ensued. Thus, even in the absence of defense expert testimony, counsel posited through other witnesses that defendant's actions did not fulfill the elements of the charged offenses, including intent, and succeeded in convincing the jury that defendant was not guilty of felony-murder.

sessions did not alter the nature of defendant's interview despite not being re-appraised of the conditions. We find no error in this determination.

With regard to the length of questioning, the trial court found that this factor also weighed against a finding of custody. While the entire interview lasted approximately 2½ hours, defendant took 30 minutes of that time to write his initial statement. The second portion of the interview lasted 1½ hours and was the only time period challenged as custodial. The trial court concluded that the timeframe of the interview was not suggestive of a custodial interrogation. We also find no error in this determination.

The trial court found the third factor, addressing the statements made during the interview, also weighed against a finding that defendant was in custody. The trial court noted that the circumstances surrounding defendant's interview did not suggest that defendant's statement was impacted. Specifically, the trial court noted that defendant was not threatened with arrest, was not prevented from leaving, and his freedom of movement was not interfered with in a significant manner. Thus, there was no indication that the statement was the result of intimidation. We agree.

The fourth consideration involves whether defendant was physically restrained during the interview, and the trial court found this factor weighed against a custodial interview. Defendant was not restrained in any manner. He sat at a table with the interviewing detectives without handcuffs. The door to the interview room was closed, but unlocked. Indeed, defendant got up and left after he finished his written statement. The trial court thus did not err in finding that this factor weighed against a finding of custody.

The final factor concerns whether defendant was released after the interview. It is undisputed that defendant was arrested after the interview. The trial court found that this factor weighed in favor of a finding of custody. The trial court also considered whether a reasonable person in defendant's situation would believe that he was free to leave and whether the police station presented an inherently coercive environment. The trial court rejected those considerations as creating an inherently custodial environment. At the conclusion of its examination of the totality of the circumstances, the trial court found that defendant was not in custody during any portion of the police interview. Accordingly, the court concluded it was not objectively unreasonable for trial counsel to fail to file a motion seeking suppression of the statement. The trial court further found that trial counsel's failure to file a motion to suppress was successful and sound trial strategy. Specifically, during defendant's interview, Detectives Geyer and Voss both expressed their belief that defendant did not intend to kill AN. Thus, defense counsel feared that the detectives would not testify regarding the lack of intent if defendant's statement was suppressed. Thus, the trial court rejected the claim of ineffective assistance of counsel.

In light of the trial court's factual findings, we cannot conclude that the trial court clearly erred in its determination that defendant was not in custody for purposes of his interview. The record supports the trial court's determinations and the trial court properly found defendant was not entitled to have his statements from the second portion of the interview suppressed. *Barritt*

*(After Remand)*, 325 Mich App at 561, 583-584.[21]  As a result, defendant failed to show that defense counsel was ineffective by not pursuing suppression of defendant's statements.

## E.  SENTENCING

Defendant contends that his sentence, an upward departure from the recommended sentencing guidelines, was unreasonable and disproportionate.  We disagree.

Challenges to sentences that depart from the applicable guidelines range are reviewed for reasonableness.  *Lockridge*, 498 Mich at 392.  This Court reviews the reasonableness of a departure sentence for an abuse of discretion.  *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017).  "A trial court abuses its discretion when its decision falls outside the range of principled outcomes."  *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted).

The *Lockridge* Court clarified that the Michigan sentencing guidelines are advisory only.  *Lockridge*, 498 Mich at 364-365.  Consequently, "trial courts are no longer required to articulate substantial and compelling reasons to depart from the minimum sentencing guidelines range; rather, the sentence must only be reasonable."  *People v Walden*, 319 Mich App 344, 351; 901 NW2d 142 (2017).  When reviewing a sentence for reasonableness, the relevant inquiry is whether the trial court abused its discretion by violating the principle of proportionality.  *Steanhouse*, 500 Mich at 471.  The "principle of proportionality" requires "sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."  *People v Milbourn*, 435 Mich 630, 636; 463 NW2d 1 (1990); *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019).  The trial court's factual findings at sentencing are reviewed for clear error.  *Lampe*, 327 Mich App at 125-126.

A trial court may depart from the sentencing guidelines when it determines that the recommended range is disproportionate in either direction to the seriousness of the crime.  *Walden*, 319 Mich App at 352.  A court is to consider the following factors to determine whether a sentence is proportional to the sentencing offense:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Id*. at 352-353 (quotation marks and citation omitted).]

When the sentence imposed is outside the applicable sentencing guidelines range, the trial court must justify the sentence imposed with sufficient detail to facilitate appellate review.  *People v Smith*, 482 Mich 292, 311; 754 NW2d 284 (2008).  Precise words and mathematical certainty are

---

[21] We also reject defendant's contention that the reenactment video should also have been suppressed and his reliance on *Missouri v Seibert*, 542 US 600, 124 S Ct 2601; 159 L Ed 2d 643 (2004), for the reasons articulated by the trial court.  The trial court did not render factual findings pertaining to custody to render the *Seibert* decision analogous.

not required. *Id*. However, it must explain how the departure, and the extent of the departure, is more proportionate to the offense and the offender than a different sentence would have been. *Id*. If a trial court applies an incorrect legal standard or abuses its discretion as determined by the appellate court, the trial court, on remand, must exercise its discretion in accordance with the appropriate standards. *Steanhouse*, 500 Mich at 476.

Defendant's recommended minimum sentencing guidelines range was 126 to 210 months' imprisonment. The probation department recommended a prison sentence of 180 months to 50 years' imprisonment. The trial court sentenced defendant to 240 months to 50 years' imprisonment, exceeding the top of the recommended guidelines range by 30 months. When imposing sentence, the trial court noted that defendant did not have a significant criminal history, completed his education program with honors, and maintained steady employment. However, the trial court also stated that the guidelines were inadequate for numerous reasons.

First, defendant was specifically educated regarding unsafe sleep conditions with one instruction occurring two months before AN's death. Second, the 100-point score for Offense Variable (OV) 3 did not capture "the level of pain and suffering and loss that everyone has when we're dealing with a, just over one[-]year old baby. I couldn't possibly find that."[22] Third, the OV 3 scoring did not consider that AN died while under defendant's sole care. AN depended upon defendant to love and protect her. Instead, he wrapped her so tightly in a blanket that she could not move her arms and covered her mouth and nose before placing her facedown on a pillow. Fourth, although defendant recognized AN was dead, he delayed in getting her treatment, never contacted AN's mother, and was uncooperative and disruptive at the hospital. Fifth, defendant expressed no remorse until sentencing.

---

[22] At sentencing, AN's paternal aunt provided a statement regarding the impact of AN's death. It detailed her father's family's efforts to protect AN after earlier instances of suspected abuse were reported to authorities.

There is no OV directly addressing the serious psychological harm resulting from the death of a young child under these circumstances. Cf. MCL 777.34(1)(a) (requiring 10 points to be assessed when a victim suffers serious psychological injury); MCL 777.35(1)(a) and MCL 777.22 (requiring 15 points to be assessed when serious psychological injury necessitates professional treatment for the family of a victim of homicide, attempted homicide, conspiracy or solicitation to commit homicide, or assault with the intent to commit murder).

Contrary to defendant's arguments, the trial court properly considered the first,[23] fourth,[24] and fifth[25] factors in electing to impose an out-of-guidelines sentence. *Walden*, 319 Mich App at 353-355. And defendant does not challenge the court's reliance on the second factor.

Defendant, however, contends that the court's reliance on his status as AN's caregiver, while not factored into OV 3, was considered under OV 10. MCL 777.40 addresses the exploitation of a vulnerable victim. A court must assess 10 points for OV 10 when "[t]he offender exploited a victim's . . . youth . . ., a domestic relationship, or the offender abused his or her authority status." MCL 777.40. To exploit is "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). And an " '[a]buse of authority status' means a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher." MCL 777.40(3)(d). At sentencing, the trial court assessed 10 points because defendant exploited AN's youth, not because defendant exploited his authority status. Consequently, the trial court did not err because the points assessed could be viewed as inadequate where not only one, but two of the factors were present.

Moreover, the trial court determined that a slight departure was warranted for these same reasons. While mathematical precision is not required, the court explained its rationale for the departure. Because the trial court provided permissible reasons for its out-of-guidelines sentence and explained the reasons why a slight departure was warranted, it did not abuse its discretion. *Steanhouse*, 500 Mich at 471.

---

[23] Defendant argues the repeated CPS instruction simply established the knowledge common to all first-degree child abuse cases. But the trial court was not determining whether there was sufficient evidence to establish that element of the offense. Instead, it was fashioning a proportionate sentence. In doing so, the trial court reflected on the repeated CPS instruction to reject defendant's stance that AN's death was accidental or the result of ignorance regarding the potential outcome of wrapping AN in such a manner and placing her facedown into a soft pillow. Indeed, it is rare that one is directly and recurrently warned by two separate CPS workers regarding the dangers of infant suffocation.

[24] To the extent that the trial court relied on defendant's actions in stopping at four separate gas stations to obtain gas via a Bridge card, the trial court did not base its departure on the prohibited reasons enumerated in MCL 769.34(3)(a) ("gender, race, ethnicity, alienage, national origin, legal occupation, lack of employment, representation by appointed counsel, representation by retained legal counsel, appearance in propria person or religion."). Rather the court reflected on the reasons for the 27-minute delay in transporting AN to the hospital for medical attention.

[25] The trial court pointed to numerous instances inconsistent with defendant's expression of remorse at sentencing.

## F.  STANDARD 4 BRIEF[26]

In defendant's Standard 4 Brief, he alleges that the trial court abused its discretion by denying defense counsel's motion to withdraw.  Because defendant withdrew his request for substitute counsel and the trial court did not issue any ruling on the motion, he is not entitled to appellate relief.

A trial court's decision regarding substitution of counsel is reviewed for an abuse of discretion.  *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015).  An indigent defendant is guaranteed the right to counsel, but is not entitled to have the attorney of his choice.  *Id*.  Rather, substitution of counsel is warranted where there is a showing of good cause and where substitution will not interfere with the judicial process.  *Id*. at 382-383.  A defendant may not harbor error as an appellate parachute by expressing satisfaction with a ruling or action in the trial court and raise it as an error on appeal.  *People v Carter*, 462 Mich 206, 214-215; 612 NW2d 144 (2000).  Rather, the approval of the trial court's response results in defendant's waiver of the issue on appeal.  *Id*. at 215.

At the hearing on the motion to quash held on February 7, 2019, defendant personally addressed the trial court and expressed concern with counsel's representation, citing letters previously mailed to the trial court.  The trial court advised that it did not respond to ex parte letters and a formal motion should be filed if there was a breakdown in the attorney-client relationship.  Defense counsel formally moved to withdraw because defendant expressed dissatisfaction with his representation, and a hearing was held on March 7, 2019.  Defendant explained that he was in the process of raising funds to retain counsel.  The trial court advised defendant that it would grant his request for substitute counsel.  However, the trial would need to be postponed because defendant's new counsel would not have time to adequately prepare for the trial scheduled for March 11, 2019.  In response to defendant's inquiry, the trial court could not provide a date certain for the rescheduled trial at that time, but noted that defendant's case would be given priority because he was in jail.  The trial court allowed a recess to permit defendant to confer with defense counsel.  After speaking with defense counsel, defendant ultimately decided to abandon his request for substitute counsel and proceed to trial on March 11, 2019.  When the trial court asked if defendant was satisfied with defense counsel's representation to proceed to trial, defendant responded, "Yes sir."

Additionally, at a hearing held on March 8, 2019, the trial court addressed the prosecutor's motion to amend the witness and exhibit lists.  Upon questioning by the trial court, defense counsel admitted that defendant was aware of the witnesses to be called and could not claim prejudice from the amendment.  Defense counsel further noted that he declined to request an adjournment to prepare for cross-examination of these added witnesses because defendant wished to proceed to trial on March 11, 2019.

On appeal, defendant contends that the trial court erred by denying the motion to withdraw and forcing him to proceed with counsel "who barely defended him."  The record reflects that

---

[26] Defendant's Standard 4 Brief was filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

defendant was afforded the opportunity to meet with defense counsel. Following this meeting, defendant withdrew his request to have defense counsel withdraw and agreed to proceed to trial. Moreover, defense counsel vigorously challenged the prosecutor's case and obtained an acquittal on the felony-murder charge. Thus, defendant waived this issue and may not harbor error as an appellate parachute. *Id*. at 214-215.

Defendant also seemingly raises an issue challenging the prosecutor's failure to disclose discovery.[27] This issue was only raised in defendant's statement of questions presented. Given his cursory treatment without elaboration,[28] his claim is abandoned. *People v Henry*, 315 Mich App 130, 148-149; 889 NW2d 1 (2016).

Affirmed.

/s/ Deborah A. Servitto
/s/ Anica Letica

---

[27] Defendant's brief on appeal identified issue seven as "Whether the evidence nondisclosed by the prosecution of knowledge jeopardized or cause[d] a bias[ed] or unfair act under the Constitution?"

[28] In the statement of questions presented, defendant notes his issue is similar to a *Brady v Maryland*, 373 US 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), violation, but fails to explain how or why. Defendant identifies the nondisclosed evidence as the "DMH Health Record History[,] [t]he Post Mortem Scans[,] and [t]he Department of Health and Human Services," adding that they "[s]hined [l]ight [t]o [m]y [i]nnocence!" Defendant ends with "The Best Evidence Rule."